NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 240888-U

NO. 4-24-0888

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 15, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| In re P.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Knox County |
|     Petitioner-Appellee, | ) | No. 21JA32 |
|     v. | ) | |
| James S., | ) | Honorable |
|     Respondent-Appellant). | ) | Curtis S. Lane, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Lannerd and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court granted appellate counsel's motion to withdraw and affirmed the trial court's judgment terminating respondent's parental rights.

¶ 2    Respondent James S. appeals from the trial court's judgment terminating his parental rights to P.S. (born in 2019). Respondent's court-appointed appellate counsel moves to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), arguing this appeal presents no issue of arguable merit for review. See *In re S.M.*, 314 Ill. App. 3d 682, 685-86 (2000) (holding *Anders* applies to termination of parental rights cases and providing the proper procedure to be followed by appellate counsel). For the reasons that follow, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 3                                I. BACKGROUND

¶ 4                          A. Adjudication of Wardship

¶ 5        In August 2021, the State filed a single-count petition for adjudication of wardship, alleging that P.S. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)) in that P.S. was subjected to an environment injurious to her welfare. The State alleged, among other things, that respondent (1) was homeless; (2) was previously adjudicated as an unfit parent to a different minor in a 2017 juvenile matter, and his parental rights were terminated; and (3) failed to complete any services in the 2017 juvenile matter to become fit. P.S.'s biological mother was also a party to these proceedings but is not a party to this appeal. Following a shelter care hearing, the trial court found probable cause to support the allegations of neglect and placed temporary custody and guardianship with the Illinois Department of Children and Family Services (DCFS).

¶ 6        At a subsequent hearing, respondent stipulated to an amended petition filed by the State containing the same allegations laid out above. The trial court admonished respondent, and the State provided a factual basis. The court determined P.S. was neglected and made her a ward of the court. Custody of P.S. remained with the guardianship administrator of DCFS. At a dispositional hearing, respondent was found to remain unfit from the prior juvenile matter and had not begun services.

¶ 7                        B. Petition for Termination of Parental Rights

¶ 8        In December 2022, the State filed a petition to terminate respondent's parental rights. The petition alleged that respondent was an unfit parent under the Adoption Act (750 ILCS 50/1(D) (West 2022)) in that he failed to (1) make reasonable efforts to correct the conditions serving as the basis of the removal of P.S. during the relevant nine-month period (January 4, 2022, to October 4, 2022) (*id.* § 1(D)(m)(i)), (2) make reasonable progress toward the return of P.S.

during the relevant nine-month period (*id.* § 1(D)(m)(ii)), and (3) maintain a reasonable degree of interest, concern, or responsibility as to P.S.'s welfare (*id.* § 1(D)(b)).

¶ 9                                              1. *The Fitness Hearing*

¶ 10         In March 2024, the trial court conducted a fitness hearing. Respondent was not present for the hearing. Tara Wilder testified that she was assigned as the caseworker from January 2022 through July 2022. Respondent's service plan required that he complete a substance abuse assessment; participate in mental health services, domestic violence counseling, and parenting classes; comply with drug screens; and maintain employment, along with stable and appropriate housing. Respondent failed to complete any of the services during the relevant time period but completed some of the services afterward. Respondent lived with his mother during the pendency of this matter, but the home was not an appropriate placement for P.S. because she could not pass the required background check. Respondent held several different jobs during the course of the case and switched jobs frequently. He did not provide proof of employment, but Wilder witnessed him working one of the jobs. Respondent was also required to comply with weekly drug tests, but he only completed "ten to twenty" percent of those tests. Respondent regularly visited P.S. and was appropriate during those visitations.

¶ 11         Karen Moore was the caseworker from July 2022 through October 2022. The services respondent was required to complete while Moore was the caseworker had not changed from those in place when Wilder served in that role. Respondent failed to complete the required services and was twice removed from required programs due to positive drug tests, inconsistent participation, and an altercation with another individual in one of the programs. He submitted to drug tests while Moore was the caseworker, but the majority of the results were positive. Respondent was discharged twice from the domestic violence program for inconsistent attendance

and because he was "having an issue with another person that was in the program." Visitation with P.S. was consistent and went well, as respondent was always "appropriate and nurturing" and "used positive parenting skills." Eventually, he was required to produce a negative drug test prior to visitation, and he was denied visitation when he tested positive. Respondent had an apartment, but Moore was unable to inspect it despite several scheduled visits because "he always had other things or he would not respond."

¶ 12      The trial court found that P.S. was no closer to being returned to respondent's care than when the case began and determined respondent was unfit based on the grounds articulated in the State's petition.

¶ 13                                    2. *The Best Interest Hearing*

¶ 14      The best interest hearing ensued. Wilder again testified, stating she was the caseworker assigned to the case from January 2022 until Moore took over the case and she resumed working on the case after Moore. P.S. had been in foster care for over two and a half years and had been in the current placement for almost two years—half of her life. Respondent was appropriate and loving during visitation. P.S. knew respondent was her father and Wilder could tell "she loves her dad and he loves her."

¶ 15      Wilder visited the foster home monthly. There were no issues with the home, and P.S. referred to the foster parents as "Mom" and "Dad." P.S. did not understand the workings of the situation but understood "she has two dads." The foster parents provided for her physical and emotional needs, and P.S. was bonded to her foster parents and foster siblings. P.S. was "thriving" in the placement, and the foster parents expressed a desire to adopt P.S. and give her permanence.

¶ 16      The foster mother testified that she and her husband were willing to adopt P.S. P.S. was bonded with the other children in the home and the extended families of the foster parents.

P.S. loved respondent and looked forward to her visits with him. If the matter proceeded to an adoption, the foster mother would not cut respondent out of P.S.'s life, as "she'd have a hard time with that." Rather, the foster mother would facilitate the relationship, as long as it was "safe and healthy." If it became problematic, they would take a break and try to reengage at a later time.

¶ 17　　Respondent testified that he lived with his mother and was not employed but was starting full-time employment the following week; he also delivered for DoorDash. He loved P.S. and believed that she loved him. He described their visitation and how she called him "Dad." P.S. had not lived with him for over two and a half years. He had attempted to have P.S. placed at his mother's house, where he lived, but DCFS stated the placement was not possible. He had an apartment for a period of time during the case but ended up moving back in with his mother when "it didn't end up working out."

¶ 18　　The trial court recalled Wilder to the stand to inquire why the grandmother's home was not an acceptable placement. Wilder stated that the grandmother did not receive clearance based on "her history." When pressed, Wilder could not remember the exact issue precluding placement except that it was due to an issue with her criminal history. The grandmother "became belligerent" when DCFS tried to discuss the issue with her, causing concern about placement at the home in general. During closing arguments, counsel for respondent contested the assertion by Wilder that there was any criminal issue preventing placement. Counsel stated, "My client's mother has no criminal history whatsoever."

¶ 19　　The trial court considered the statutory best interest factors and found that they favored the termination of respondent's parental rights. The court reasoned, "While it's wonderful that there is a sense of attachment and there is a bond to at least the father, that bond is clearly outweighed by the remainder of the best interest factors."

¶ 20        This appeal followed.

¶ 21                              II. ANALYSIS

¶ 22        Appellate counsel now moves to withdraw pursuant to *Anders* and argues that respondent's appeal presents no potentially meritorious issue for review. See *S.M.*, 314 Ill. App. 3d at 685-86. Counsel states he has reviewed the record on appeal and has identified two potential issues for review: (1) whether the trial court's determination that respondent was unfit was against the manifest weight of the evidence and (2) whether the court's determination that termination of respondent's parental rights was in the best interest of P.S. was against the manifest weight of the evidence. Counsel provided respondent notice of the motion to withdraw, and this court followed with its own notice. Respondent has not filed a response. After reviewing the record and appellate counsel's memorandum, we agree with counsel that this appeal presents no issue of potential merit. We therefore grant the motion to withdraw and affirm the court's judgment.

¶ 23                         A. Unfitness Finding

¶ 24        Section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2022)) provides for a two-step process to involuntarily terminate parental rights. The State must first prove by clear and convincing evidence that the respondent is "unfit" as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). *In re N.G.*, 2018 IL 121939, ¶ 28.

¶ 25        In this case, the trial court determined respondent was unfit on two of the three bases alleged in the State's petition. However, a "parent's rights may be terminated if a single alleged ground for unfitness is supported by clear and convincing evidence." *In re D.C.*, 209 Ill. 2d 287, 296 (2004). Here, we focus on the ground that respondent failed to make reasonable progress toward the return of P.S. during the relevant nine-month period pursuant to section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2022)).

"Reasonable progress is examined under an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. [Citation.] The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent. [Citation.] Reasonable progress exists when the trial court can conclude that progress being made by a parent to comply with directives given for the return of the minor is sufficiently demonstrable and of such a quality that the trial court will be able to order the minor returned to parental custody in the near future." *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17.

¶ 26 The trial court is in a superior position to observe witnesses and evaluate their credibility. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002). Accordingly, the court's findings regarding parental unfitness are afforded great deference and will not be reversed unless against the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident." *In re C.N.*, 196 Ill. 2d 181, 208 (2001).

¶ 27 Respondent in this case failed to complete any of the court-ordered services during the relevant time period and produced positive drug tests when he did comply with the testing regimen. Respondent failed to make reasonable progress toward the return of P.S. during the relevant nine-month period, and the trial court did not err in finding respondent was making no progress toward having P.S. returned to his custody in the near future. Therefore, it would be

frivolous to argue that the court's unfitness finding was against the manifest weight of the evidence.

¶ 28                                    B. Best Interest Determination

¶ 29        If a trial court finds a parent to be unfit, it then determines whether the best interest of the child requires that parental rights be terminated. *In re D.T.*, 212 Ill. 2d 347, 352 (2004). At the best interest stage of termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71. In reaching a best interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors, which are derived from section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)):

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32.

¶ 30        "The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below

in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. Additionally, a trial court "may consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his emotional and psychological well-being." *In re Jaron Z.*, 348 Ill. App. 3d 239, 262 (2004). We afford great deference to the trial court's best interest finding due to the court's superior position in viewing the witnesses and judging their credibility. *J.B.*, 2019 IL App (4th) 190537, ¶ 33. We will not disturb the trial court's judgment at this stage unless it is against the manifest weight of the evidence. *Id.*

¶ 31        In this case, P.S. had been in foster care for the majority of her life. The foster parents provided for her safety, shelter, and general welfare. P.S. was bonded with her foster parents and her foster family, and the foster parents sought to provide permanence. We share the sentiment of the trial court in its acknowledgment that there is clearly a loving bond between P.S. and respondent and that P.S. recognizes him as her biological father. However, the bond between respondent and P.S. is alone insufficient to reverse the court's decision. See *D.T.*, 212 Ill. 2d at 364 ("[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life."). While P.S. is attached to respondent, P.S.'s familial background and ties, as well as continuity of affection and least disruptive placement, all reside with the foster parents. On balance, the factors do not show that the judgment of the trial court was against the manifest weight of the evidence.

¶ 32        Having reviewed the record, we agree with counsel that there is no arguable issue of merit that could be advanced challenging the trial court's best interest finding.

¶ 33                                III. CONCLUSION

¶ 34        For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 35          Affirmed.